IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| IAN C., AND A. C.,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED HEALTHCARE INSURANCE COMPANY,<br><br>Defendant. | **MEMORANDUM DECISION AND ORDER**<br><br>Case No. 2:19-cv-474<br><br>Howard C. Nielson, Jr.<br>United States District Judge |

Plaintiffs Ian C. and A.C. sued United Healthcare Insurance, asserting two claims under ERISA (the Employee Retirement Income Security Act, 29 U.S.C. § 1001 *et seq.*): (1) a claim for payment of improperly denied benefits, and (2) a claim for violations of the Mental Health Parity and Addiction Equity Act. Later, Plaintiffs voluntarily dismissed the Parity Act claim with prejudice. *See* Dkt. No. 37. Both sides move for summary judgment on the remaining claim. *See* Dkt. Nos. 38, 39. For the following reasons, the court grants summary judgment in favor of United.

I.

United serves as the claims fiduciary for the Insperity Group Health Plan. *See* AR 1611.[1] The Plan expressly grants discretionary authority to United in this capacity. *See* AR 1612. Ian C. was a participant in the Plan and A.C. was a beneficiary. *See* Dkt. No. 26 ¶¶ 2–3. The Plan

---

[1] Citations to the administrative record are noted "AR XX." The administrative record can be found at Dkt. Nos. 42-1 through 42-16.

1

provides benefits for various "Covered Health Services" if the services are determined to be "Medically Necessary." AR 1489; *see also* AR 1552. This includes mental health and substance use disorder services at a Residential Treatment Facility, subject to prior authorization. *See* AR 1451–52.

To be "Medically Necessary," "health care services" must be "provided for the purpose of preventing, evaluating, diagnosing or treating a Sickness, Injury, Mental Illness, substance-related and addictive disorders, condition, disease or its symptoms." AR 1556. Such services must be determined by the plan to be: (1) "[i]n accordance with *Generally Accepted Standards of Medical Practice*"; (2) "[c]linically appropriate, in terms of type, frequency, extent, site and duration, and considered effective for" the member's "Sickness, Injury, Mental Illness, substance-related and addictive disorders, disease or its symptoms"; (3) "[n]ot mainly for" the "convenience" of the member or the member's "doctor or other health care provider"; and (4) "[n]ot more costly than an alternative drug, service(s) or supply that is at least as likely to produce equivalent therapeutic or diagnostic results as to the diagnosis or treatment of" the member's "Sickness, Injury, disease or symptoms." *Id.*

The Plan states that United "develop[s] and maintain[s] clinical policies that describe the *Generally Accepted Standards of Medical Practice*, scientific evidence, prevailing medical standards and clinical guidelines" to support its benefit determinations. *Id.* United thus promulgated the "Optum Level of Care Guidelines." These include, among others, Level of Care Guidelines for Residential Treatment of Mental Health Conditions, *see* AR 27–29, and Level of Care Guidelines for Substance-Related Disorders, *see* AR 31–33.

The Residential Treatment of Mental Health Guidelines define a Residential Treatment Center as "[a] sub-acute facility-based program which delivers 24-hour/7-day assessment and

diagnostic services, and active behavioral health treatment to members who do not require the intensity . . . offered in Inpatient." AR 27. Treatment is focused on "addressing the 'why now' factors that precipitated admission" such as "changes in the member's signs and symptoms, psychosocial and environmental factors, or level of functioning" until the member's condition can be "safely, efficiently and effectively treated in a less intensive level of care." *Id.*

For treatment to be covered under these guidelines, (1) the member must meet the "Common Criteria for All Levels of Care," (2) the member must not be "in imminent or current risk of harm to self, others, and/or property," and (3) the member's symptom's cannot "be safely, efficiently or effectively assessed and/or treated in a less intensive setting due to acute changes in the member's [condition] and/or psychosocial and environmental factors." *Id.* Continued treatment in a residential treatment center is not covered if it is primarily for the purpose of providing custodial care, including "[n]on-health-related services, such as assistance in activities of daily living," "[h]ealth-related services" with "the primary purpose of meeting the personal needs of the patient or maintaining a level of function" instead of enabling the patient to have "a more independent existence," or "[s]ervices that do not require continued administration by trained medical personnel in order to be delivered safely and effectively." AR 28.

The Substance-Related Disorder Guidelines' definition of a Residential Rehabilitation Center largely tracks the Mental Health Guidelines' definition of a Residential Treatment Center. *See* AR 31. For substance-related treatment in a residential rehabilitation center to be covered, (1) the member must meet the "Common Criteria for All Levels of Care," (2) there must be "no risk of withdrawal, or the signs and symptoms of withdrawal can be safely managed," (3) "[t]he 'why now' factors leading to the member's admission and/or the member's history of response to treatment" must "suggest that there is imminent or current risk of relapse which cannot be safely,

3

efficiently, and effectively managed in a less intensive level of care," and (4) the member's condition cannot "be safely, efficiently, or effectively assessed and/or treated in a less intensive setting due to acute changes in the member's signs and symptoms, and/or psychosocial and environmental factors" AR 31–32. Continued treatment in a residential rehabilitation center is contingent on the same considerations as continued treatment in a residential treatment center. *See* AR 32.

In April 2016, as a result of worsening mental health issues and increasing substance abuse, A.C. was placed at BlueFire Wilderness, an outdoor behavioral health program. *See* AR 102–04, 1022. At the time of his admission, A.C. was diagnosed with "F90.0 Attention-deficit/hyperactivity disorder, Predominantly inattentive presentation"; "F10.20 Alcohol use disorder, Moderate"; and "F32.9 Unspecified depressive disorder." AR 54. A.C. remained at BlueFire for 78 days until his discharge on June 23, 2016. *See* AR 1022.

A.C. was then admitted to Catalyst Residential Treatment Center on June 24, 2016. *See* AR 1368, 1370. Upon arrival, A.C.'s primary diagnosis was "F41.1-Generalized anxiety d/o" with additional diagnoses of "F34.1-Persistent depressive d/o (dysthymia)," "F91.3-Oppositional defiant d/o," "F10.20-Alcohol use d/o, Severe," "F12.20-Cannabis use d/o, Severe," and "F90.0-Attention-deficit/hyperactivity, Predominant inattentive."[2] AR 1369. Substance abuse was not the primary driver for admission. *See* AR 1371.

The same day, Catalyst requested precertification for 7 days of residential mental health treatment. *See* AR 1367, 1374. United ultimately authorized 14 days of treatment. *See* AR 1375–

---

[2] Catalyst's master treatment plan describes slightly different diagnoses. Specifically, in this plan, A.C. was also diagnosed with "F32.9 Unspecified depressive disorder" and "Z62.820 Parent-child relational problem," but not with "F34.1-Persistent depressive d/o (dysthymia)," "F91.3-Oppositional defiant d/o," or "F90.0-Attention-deficit/hyperactivity, Predominant inattentive." AR 336.

4

1400. On July 7th, Catalyst requested 30–60 additional days. *See* AR 1411. United reviewed the "clinical information provided" and the diagnosis and preliminarily determined that "the treatment being recommended and/or provided does not appear to be consistent with generally accepted standards of medical practice for the treatment of such conditions" and that it appeared that A.C. could safely be managed at a lower level of care, such as intensive outpatient treatment. *Id.* United then referred the case to clinical peer review. *See id.*

On July 8th, Dr. Sheryl Jones conducted a peer-to-peer review with Catalyst's representative. *See* AR 1413. The representative stated that Catalyst wanted to work on some "skill generalization" for A.C. and address his coping skills. AR 1415. The representative also stated that A.C.'s risk of relapse was moderate and that he was still engaged in manipulation. *See id.* The representative described A.C. as "medically stable," with no serious withdrawals or post-acute withdrawal symptoms, and stated that A.C.'s mood was stable and "euthymic." *Id.* Finally, the representative stated that A.C. was actively participating in group therapy; was not suffering from suicidality, homicidality, or psychosis; and was sleeping and eating adequately. *See id.* The representative indicated that Catalyst had made no rating for A.C.'s addiction cravings and that there was no other relevant information for Dr. Jones to review prior to making a determination. *See id.*

On July 12th, Dr. Jones issued a denial letter on behalf of United, stating that, based on the Residential Mental Health Guidelines, no further authorization could be provided from July 8th onward. *See* AR 21–22. Dr. Jones explained that although A.C. was "admitted for treatment of mood and behavioral problems and for treatment of substance use," it appeared that A.C. had made sufficient progress that his condition "no longer [met] the guidelines for coverage of treatment in this setting." AR 21. Dr. Jones noted that A.C.'s mood was stable, he was "not

5

planning to harm himself or others," and he was not "violent or aggressive." *Id.* She also noted that A.C. had "attended groups to learn coping skills and ways to manage his triggers" and was "medically stable." *Id.* Finally, Dr. Jones observed that A.C. did not have "serious withdrawal or post-acute withdrawal symptoms," was "taking medication to help control his symptoms," and had the support of his family. AR 21–22. Dr. Jones thus concluded that A.C. did not "seem to have any symptoms that would require 24-hour monitoring, support or care" and it "seem[ed] that he could safely and effectively continue care in the Mental Health/Dual Diagnosis Intensive Outpatient Program setting." AR 22. Dr. Jones then provided a link to the Optum Level of Care Guidelines and information on appeal rights. *See id.*

      A.C. continued treatment at Catalyst and, on January 4, 2017, Plaintiffs initiated a "level one member appeal review of the adverse benefit determination." AR 2. In their appeal letter, Plaintiffs argued that the initial determination was flawed because it relied solely on the Residential Mental Health Guidelines and did not consider the Substance-Related Disorders Guidelines. *See* AR 3. Plaintiffs also contested Dr. Jones's analysis under any of the guidelines and included copies of both sets of guidelines, excerpts of a letter from A.C.'s longtime clinical psychologist, Dr. Peacock, medical records purporting to show that treatment was medically necessary, and a psychological evaluation performed by Dr. Jeremy Chiles—a psychologist with Catalyst. *See* AR 3–14. Plaintiffs asserted that United had violated ERISA's regulations, *see* AR 5–6, and requested: (1) a "full, fair, and thorough" review of the claim; (2) exact references to the medical records and other documentation provided; (3) the psychiatric credentials of Dr. Jones, and all subsequent reviewers; and (4) for all reviewers to use both the Residential Mental Health and Substance-Use Disorder Guidelines, AR 14.

6

United affirmed the initial determination in a subsequent letter dated January 19, 2017. *See* AR 1220. The review was conducted by Dr. Cheryl Person, who stated that it included an examination of the "appeal letter, case notes, medical records and Optum Level of Care Guideline for the Mental Health Residential Treatment Center Level of Care." AR 1220–21. Dr. Person determined that benefit coverage was not available under those guidelines. *See id*. Specifically, she noted that A.C. was admitted for treatment of his General Anxiety Disorder and that he "had made progress and that [his] condition no longer met Guidelines for further coverage of treatment in this setting." AR 1220. She explained that he "was not endangering the welfare of himself or others. He was attending and participating in programming. He was able to understand treatment and was tapered off his antidepressants as his mood was stable. He [did] not require 24-hour nursing care or supervision provided at this level." AR 1220–21. She determined that his remaining symptom of "parental-child conflict" could be addressed in a "less restrictive setting" and that A.C. "could have continued care in the Mental Health Intensive Outpatient Program setting." AR 1221. Finally, Dr. Person explained that this was "the Final Adverse Determination" and all internal appeals by United had been exhausted. *Id*.

Plaintiffs then brought this suit.

## II.

When both parties in an ERISA case move for summary judgment and stipulate that no trial is necessary, "summary judgment is merely a vehicle for deciding the case; the factual determination of eligibility for benefits is decided solely on the administrative record, and the non-moving party is not entitled to the usual inferences in its favor." *LaAsmar v. Phelps Dodge Corp. Life, Accidental Death & Dismemberment & Dependent Life Ins. Plan*, 605 F.3d 789, 796 (10th Cir. 2010) (cleaned up). The court reviews a denial of benefits "under a *de novo* standard

7

unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).

"Where the plan gives the administrator discretionary authority, however, '[courts] employ a deferential standard of review, asking only whether the denial of benefits was arbitrary and capricious.'" *LaAsmar*, 605 F.3d at 796 (quoting *Weber v. GE Group Life Assurance Co.*, 541 F.3d 1002, 1010 (10th Cir. 2008)). Under this standard, "review is limited to determining whether the interpretation of the plan was reasonable and made in good faith." *Kellogg v. Metro. Life Ins. Co.*, 549 F.3d 818, 826 (10th Cir. 2008) (cleaned up). The administrator's decision will be upheld unless it is "not grounded on *any* reasonable basis." *Kimber v. Thiokol Corp.*, 196 F.3d 1092, 1098 (10th Cir. 1999) (cleaned up). "This standard is a difficult one for a claimant to overcome." *Nance v. Sun Life Assurance Co. of Canada*, 294 F.3d 1263, 1269 (10th Cir. 2002).

### III.

The parties dispute both the applicable standard of review and the merits. The court first addresses the standard of review.

### A.

Plaintiffs concede that because the Plan vests discretionary authority in the administrator, arbitrary and capricious review would ordinarily apply. *See* Dkt. No. 39 at 18; *see also* AR 1612. In this case, however, they contend that United committed multiple procedural violations and that *de novo* review is therefore required. *See* Dkt. No. 39 at 18–24; Dkt. No. 46 at 4–5. The Tenth Circuit has held that *de novo* review is appropriate despite a delegation of discretionary authority when the case involves "serious procedural irregularities." *Martinez v. Plumbers & Pipefitters Nat'l Pension Plan*, 795 F.3d 1211, 1215 (10th Cir. 2015).

ERISA requires "every employee benefit plan" to "provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant," and "a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim." 29 U.S.C. § 1133. The regulations implementing the statute further mandate that the plan administrator reference "the specific plan provisions on which the determination is based," and provide "[a] description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary." 29 C.F.R. § 2560.503-1(g)(1)(ii)–(iii).

In the event of an adverse benefit determination based on medical necessity, a group health plan must provide "either an explanation of the scientific or clinical judgment for the determination, applying the terms of the plan to the claimant's medical circumstances, or a statement that such explanation will be provided free of charge upon request." *Id.* § 2560.503-1(g)(1)(v)(B). Likewise, if the plan relies on "an internal rule, guideline, protocol, or other similar criterion . . . in making the adverse determination," the plan must either provide that material or state "that such a rule, guideline, protocol, or other similar criterion was relied upon in making the adverse determination and that a copy . . . will be provided free of charge to the claimant upon request." *Id.* § 2560.503-1(g)(1)(v)(A).

When a claimant appeals an adverse benefits determination, the Plan must provide a "full and fair review" that "takes into account all comments, documents, records, and other information submitted by the claimant relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination." *Id.* § 2560.503-

1(h)(2). This review must "not afford deference to the initial adverse benefit determination" and must be conducted by a different individual who is not a subordinate to the original reviewer. *Id.* § 2560.503-1(h)(3)(ii).

Based on its interpretation of the 1998 version of the regulations, the Tenth Circuit has long held that even if technical procedural violations have occurred, arbitrary and capricious review of an administrator's decision is still warranted so long as the administrator has substantially complied with the regulations. *See Gilbertson v. Allied Signal, Inc.*, 328 F.3d 625, 634–35 (10th Cir. 2003); *Kellogg*, 549 F.3d at 828. Plaintiffs argue, however, that this "substantial compliance" standard cannot be reconciled with subsequent regulatory changes. *See* Dkt. No. 39 at 18–22.

In 2002, the regulations were amended to provide that when a plan fails "to establish or follow claims procedures consistent with the requirements" of Section 2560.503-1, a claimant may "pursue any available remedies under section 502(a) of the Act on the basis that the plan has failed to provide a reasonable claims procedure that would yield a decision on the merits of the claim." 29 C.F.R. § 2560.503-1(l)(1) (2002). The accompanying preamble explains that this change was made "to clarify that the procedural minimums of the regulation are essential to procedural fairness and that a decision made in the absence of the mandated procedural protections should not be entitled to any judicial deference." ERISA Rules and Regulations for Administration and Enforcement; Claims Procedure, 65 Fed. Reg. 70246, 70255 (Nov. 21, 2000); *see also Halo v. Yale Health Plan, Dir. of Benefits & Recs. Yale Univ.*, 819 F.3d 42, 49–57 (2d Cir. 2016) (holding that the "substantial compliance" standard is incompatible with the revised regulations).

10

Further changes to the regulations were made in 2011. Section 2590.715-2719 now states that if a plan "fails to *strictly adhere* to all the requirements" of Section 2590.715-2719(b)(2)—which incorporates Section 2560.503-1—and the claimant pursues a claim under Section 502(a) of ERISA, "the claim or appeal is deemed denied on review without the exercise of discretion by an appropriate fiduciary." 29 C.F.R. § 2590.715-2719(b)(2)(ii)(F)(1) (emphasis added). This regulation, however, exempts both grandfathered plans—plans in existence prior to March 23, 2010, *see id.* § 2590.715-2719(a)(1)(ii)—and "de minimis violations" that do not prejudice the claimant, occur for good cause, and are "in the context of an ongoing, good faith exchange of information between the plan and the claimant," *id.* § 2590.715-2719(b)(2)(ii)(F)(2).

The parties do not identify anything in the administrative record indicating whether the plan at issue here was in existence prior to March 23, 2010. It is thus unclear whether the stricter regulatory language applies. That aside, the court believes that Plaintiffs' textual argument has some force, as the Tenth Circuit has occasionally acknowledged. *See LaAsmar*, 605 F.3d at 800 n.7; *Rasenack ex rel. Tribolet v. AIG Life Ins. Co.*, 585 F.3d 1311, 1316 (10th Cir. 2009); *Kellogg*, 549 F.3d at 828. Nevertheless, the Tenth Circuit has continued to apply the "substantial compliance" standard and it remains binding precedent. *See Holmes v. Colorado Coal. for Homeless Long Term Disability Plan*, 762 F.3d 1195, 1211 (10th Cir. 2014); *Jaremko v. ERISA Admin. Comm.*, 525 F. App'x 692, 694 (10th Cir. 2013). The court will accordingly consider whether United "substantially complied" with ERISA's procedural requirements.

Plaintiffs argue that United committed six procedural violations in evaluating their claim and appeal. First, Plaintiffs contend that United failed to evaluate whether A.C.'s treatment was medically necessary to treat his substance abuse disorders. *See* Dkt. No. 39 at 25–27. Even assuming that such a failure would constitute a *procedural* violation, Plaintiff's argument is not

11

supported by the record.[3] In the initial denial letter, Dr. Jones acknowledged that A.C. was admitted for "treatment of mood and behavioral problems *and for treatment of substance use*." AR 21 (emphasis added). She went on to state that A.C. had learned "ways to manage his triggers," was "medically stable," and did *"not have serious withdrawal or post-acute withdrawal symptoms*." *Id.* (emphasis added). Finally, she determined that A.C. "could safely and effectively continue care in the Mental Health/*Dual Diagnosis* Intensive Outpatient Program setting." AR 22 (emphasis added). Dr. Jones thus discussed various aspects of A.C.'s substance abuse and recommended lower intensity *dual diagnosis* treatment going forward.

      Critically, even if Dr. Jones considered only the Residential Mental Health guidelines, those guidelines required her to consider A.C.'s substance abuse issues. Section 1.1 of the Residential Mental Health Guidelines dictates that the patient's condition must first be assessed under the "Common Criteria for All Levels of Care." AR 27. Section 1.6 of the "Common Criteria," in turn, requires a determination that "[c]o-occurring behavioral health and medical conditions can be safely managed." AR 1802. In determining that A.C. could continue in the Intensive Outpatient Program, Dr. Jones thus necessarily concluded that his co-occurring conditions could safely be managed at that level, meaning that residential substance abuse treatment was not medically necessary. *See* AR 31 (explaining that residential treatment is only medically necessary if the member's condition "cannot be safely, efficiently, and effectively treated in a less intensive level of care" (quoting the Substance-Related Disorder guidelines)).

---

      [3] The regulations require the plan administrator to provide a claimant with "[t]he specific reason or reasons for the adverse determination." 29 C.F.R. § 2560.503-1(g)(1)(i), (j)(1). Here, United stated that it denied the claim because treatment was not medically necessary under the Residential Mental Health Guidelines, *see* AR 21–22—thus providing the "specific reason" for the denial. To the extent Plaintiffs argue that United should have considered additional guidelines or factors, they appear to assert a substantive, rather than procedural, error.

Although Dr. Person failed to address A.C.'s substance abuse explicitly in her letter denying Plaintiff's appeal, her internal notes make two references to A.C.'s substance abuse. *See* AR 1425. It is thus clear that Dr. Person took A.C.'s substance abuse into account when she reviewed the initial determination. *See Mary D. v. Anthem Blue Cross Blue Shield*, 778 F. App'x 580, 589 (10th Cir. 2019). And like Dr. Jones, Dr. Person also applied the Residential Mental Health guidelines, which include the "Common Criteria," *see* AR 1220, and thus necessarily required her to consider A.C.'s substance abuse, as already explained. Even assuming that Plaintiffs' argument goes to procedure rather than substance, the court accordingly concludes that Dr. Jones's and Dr. Person's consideration of A.C.'s substance abuse substantially complied with ERISA's procedural requirements.

Next, Plaintiffs argue that United failed to demonstrate that it considered any of the evidence submitted by Plaintiffs with their appeal. *See* Dkt. No. 39 at 34–35. Dr. Person expressly stated in the appeal decision letter that she had reviewed the "appeal letter," however, which contained all of Plaintiffs' evidence. *See* AR 1220. Section 2560.503-1(h)(2) mandates a "full and fair review" that "*takes into account* all comments, documents, records, and other information submitted by the claimant relating to the claim." (Emphasis added.) It does not, however, require the administrator to *explicitly discuss* the evidence submitted by the claimant. *Compare* 29 C.F.R. § 2560.503-1(h)(2) *with id.* § 2560.503-1(g)(1)(vii)(A)(i) (requiring administrators to explain the basis for disagreeing with certain evidence submitted by a long-term disability claimant); *see also Mary D.*, 778 F. App'x at 589 ("[W]e [are not] aware of any [authority] that required Anthem and the Benefits Committee to affirmatively *respond* to these [claimant's] submissions. Instead, subsection (h) merely required Anthem and the Benefits Committee to 'take[]' these materials and arguments 'into account.'" (footnote omitted)).

13

Likewise, United's alleged failure to "engage with the opinions of A.C.'s treating professionals" does not constitute a procedural violation. Dkt. No. 39 at 32–34. Although the regulation expressly requires administrators denying *disability benefits* to engage with these opinions, *see* 29 C.F.R. § 2560.503-1(g)(1)(vii)(A)(i), here it required only that United take these opinions "into account," 29 C.F.R. § 2560.503-1(h)(2)(iv). In the appeal letter, Dr. Person said they were taken into account and Plaintiffs offer no basis for concluding otherwise. *See J.L. v. Anthem Blue Cross*, 510 F. Supp. 3d 1078, 1087–88 (D. Utah 2020) (rejecting the same argument and stating "[t]he administrative record contains this information, and Plaintiffs have provided no basis for their assertion that the records were not reviewed").

Plaintiffs also argue that United erred in applying the guidelines instead of the Plan's terms. *See* Dkt. No. 39 at 27–32. As explained, however, the Plan specifically contemplated that United would generate guidelines describing "Generally Accepted Standards of Medical Practice"—which in turn would be used to determine medical necessity. *See* AR 1556. United thus adhered to the terms of the Plan when assessing Plaintiffs' claim for benefits.

Plaintiffs next contend that United violated the regulations by not providing "[a] description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary." *See* Dkt. No. 39 at 19 (quoting 29 C.F.R. § 2560.503-1(g)(1)(iii)). But by its own terms, this provision only applies when a claim is unperfected—in other words, *procedurally* inadequate, not *substantively* deficient. Here, Plaintiffs' claim was denied on the merits, not for a failure to supply requisite information or "perfect" the claim. *See Brehmer v. Inland Steel Indus. Pension Plan*, 114 F.3d 656, 662 (7th Cir. 1997) ("Brehmer's claim was not 'unperfected' due to missing information, but rather was denied because of the nature of her separation.").

Finally, Plaintiffs argue that United committed a procedural violation by not attempting to "engage in a 'meaningful dialogue' with Plaintiffs concerning United's denial rationales." Dkt. No. 39 at 23. The "meaningful dialogue" requirement stems from Section 2560.503-1(g) & (h). *See Metzger v. UNUM Life Ins. Co. of Am.*, 476 F.3d 1161, 1168 n.4 (10th Cir. 2007). These provisions require the administrator to explain the initial decision and consider any information submitted by the claimant during an appeal. "Together, these requirements enable claimants to submit informed responses to the adverse decision and to engage in meaningful dialogue with the plan administrator." *Id.* Here, Dr. Jones stated in the initial decision that lack of medical necessity was the reason for denial, noted the guidelines used to make the determination, and explained the specific aspects of A.C.'s condition that supported her conclusion. *See* AR 21–22. Plaintiffs then submitted additional information and Dr. Person specifically stated in the appeal letter that she considered those materials during the review. *See* AR 2–14, 1220–21. The court concludes that this is sufficient to "substantially comply" with the procedural requirements.

For these reasons, Plaintiffs have not shown "serious procedural irregularities." The court will review United's decision under the arbitrary and capricious standard.

### B.

Plaintiffs argue that United's denial was arbitrary and capricious for several reasons. Under this standard, the court will uphold an administrator's decision "so long as it is predicated on a reasoned basis," but "[a] lack of substantial evidence often indicates an arbitrary and capricious decision." *Adamson v. Unum Life Ins. Co. Of Am.*, 455 F.3d 1209, 1212 (10th Cir. 2006). "Substantial evidence is such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the decisionmaker," *Caldwell v. Life Ins. Co. of N. Am.*, 287 F.3d 1276, 1282 (10th Cir. 2002) (cleaned up), and "means more than a scintilla, of course, yet

15

less than a preponderance," *Adamson*, 455 F.3d at 1212. The administrator's decision "need not be the only logical one nor even the best one. It need only be sufficiently supported by facts to counter a claim that it was arbitrary or capricious." *Kimber*, 196 F.3d at 1098 (cleaned up). "Substantiality of the evidence is based upon the record as a whole." *Caldwell*, 287 F.3d at 1282. In determining whether the evidence in support of the administrator's decision is substantial, the court must thus "take into account whatever in the record fairly detracts from its weight." *Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994) (cleaned up).

Plaintiffs first argue "that an administrator's denial of benefits is arbitrary and capricious if the administrator addresses one ground for benefits (in this case, A.C.'s mental health disorders) but fails to address 'another independent ground for [benefits] presented in the record and specifically raised in [the claimant's] administrative appeal'"—namely, A.C.'s substance abuse. Dkt. No. 39 at 26 (alterations in original) (quoting *Gaither v. Aetna Life Ins. Co.*, 394 F.3d 792, 806 (10th Cir. 2004)). But as explained above, the guidelines utilized by United required consideration of A.C.'s substance abuse. And critically, the court in *Gaither* ruled against the insurance company because it "did not have substantial evidence about the extent or effects of" one basis for benefits despite having "substantial evidence supporting their conclusion" on the other ground. *Gaither*, 394 F.3d at 806.

Here, unlike in *Gaither*, United did have "substantial evidence about the extent or effects of" A.C.'s substance abuse. *Id.* Specifically, United had substantial evidence that A.C.'s substance abuse did not require residential treatment. First, substance abuse was not listed as a "primary driver" for admission. *See* AR 1371. Second, A.C. had been substance free for 11 weeks prior to seeking admission at Catalyst. *See* AR 1425. Third, the Catalyst representative informed Dr. Jones during the peer-to-peer review that the focus of A.C.'s treatment was

16

working on his "skill generalization" and coping skills. *See* AR 1415. This is supported by the Master Treatment Plan created by Catalyst. That document listed A.C.'s "Generalized Anxiety Disorder" and "Unspecified Depressive Disorder" as the first two problems to be addressed. *See* AR 338–39. Although the Master Treatment Plan also included programming to address A.C.'s "Cannabis Use Disorder," *see* AR 340, it is consistent with a conclusion that A.C. was primarily being treated for mental health issues while also receiving some secondary treatment for his substance abuse issues.

Plaintiffs further contend that United abused its discretion because A.C.'s treatment was in fact medically necessary. *See* Dkt. No. 39 at 27–28, 31–32. United, however, possessed substantial evidence supporting its contrary determination.[4] Here, both reviewing psychiatrists reached the same conclusion regarding the medical necessity of A.C.'s treatment. During the peer-to-peer review, Dr. Jones noted that A.C. was nonviolent, stable, not a risk of self-harm, sleeping and eating adequately, taking medication to help control his symptoms, and "attending groups and actively participating." *See* AR 1415. She also noted that his parents were supportive and involved, including participating in weekly therapy. *See id.* Similarly, Dr. Person noted that A.C. was "very cooperative and engaged in daily activities" and had had multiple, successful offsite stays with his family. *See* AR 1425–26. She also noted that A.C.'s mood was stable and that he was no longer taking medication for his depression or ADHD. *See* AR 1425. She observed that there were "no reports of [substance] using or fighting or other maladaptive

---

[4] Plaintiffs extensively cite an opinion from the Northern District of California that questions whether the Optum Level of Care Guidelines are consistent with "Generally Accepted Standards of Medical Practice." *See Wit v. United Behav. Health*, No. 14-CV-02346-JCS, 2019 WL 1033730, at *1 (N.D. Cal. Mar. 5, 2019). But Plaintiffs offer no Tenth Circuit authority that would support rejecting guidelines expressly contemplated by the terms of the Plan.

17

behaviors" and that A.C. "did not appear to have any episodes of endangering the welfare of himself or others." *Id.*

The court concludes that this amounts to "substantial evidence" supporting United's determination that A.C. was not suffering from an "[a]cute impairment of behavior or cognition that interferes with activities of daily living to the extent that the welfare of the member or others is endangered" or "[p]sychosocial and environmental problems that are likely to threaten the member's safety or undermine engagement in a less intensive level of care without the intensity of services offered in this level of care." AR 27–28.

Next, Plaintiffs argue that United abused its discretion by disregarding the opinions of A.C.'s treating providers and not engaging with those opinions during the appeal. *See* Dkt. No. 39 at 32–35. This argument is contradicted by both the record and Supreme Court precedent. While "Plan administrators . . . may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician," courts cannot "require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003). It follows that the only question is whether United "arbitrarily refuse[d]" to credit these opinions—meaning that it refused to do so without "substantial evidence" supporting its contrary conclusion.

Here, the record indicates that Dr. Person did consider Dr. Peacock's letter. *See* AR 1425 (referencing that letter). Dr. Peacock's letter states that A.C. "was at a point of psychological and emotional crisis at the time of the decision to admit him to an inpatient wilderness program. Since his start with the wilderness program and his subsequent admission to a therapeutic

18

boarding school, [A.C.] has shown dramatic growth." AR 50. While this letter provides evidence that A.C. needed intensive treatment at the time of his admission to BlueFire on April 7, 2016, *see id.*; AR 1022, it also indicates that he had demonstrated "dramatic growth" by October 18, 2016, the date of the letter. Likewise, Dr. Chiles's May 17th evaluation recommended that A.C. receive "residential therapeutic" treatment after completing his time at BlueFire to help him "continue to make progress, remain safe, develop a healthy and stable sense of self, and in general move forward in a positive direction." AR 104, 106. The relevant inquiry here, however, is whether A.C.'s condition could have been treated at a less intensive level of care by July 8th, when United made its determination. As explained above, there was "substantial evidence" that, after 14 days of treatment at Catalyst, A.C. no longer required residential care.

      Finally, Plaintiffs argue that "United abused its discretion when it did not articulate how it was applying the terms of the Plan and UBH Guidelines to A.C.'s medical history." Dkt. No. 39 at 25. Both denial letters, however, specifically reference the Residential Mental Health Guidelines and detail specific aspects of A.C. current condition that support the denial conclusion. *See* AR 21–22, 1220–21. And while a plan administrator must identify the specific reason for denying benefits, it is not required to give "the reasoning behind the reasons." *Flinders v. Workforce Stabilization Plan of Phillips Petroleum Co.*, 491 F.3d 1180, 1192 (10th Cir. 2007) (cleaned up). Although the letters do not make it explicit, the references to A.C.'s medical condition correspond to guidelines admission criteria. *Compare* AR 21–22, 1220–21 *with* AR 27–28, 1801–02. United's decision is not arbitrary and capricious on this ground.

\*   \*   \*

For all of these reasons, summary judgment is GRANTED in favor of United and against Plaintiffs.

**IT IS SO ORDERED.**

DATED this 11th day of August, 2022

_____
Howard C. Nielson, Jr.
United States District Judge